# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**CHARLIE LEE, et al.,**

   Plaintiffs,

v.                                             No. CV 98-1056 BB

**UNITED STATES AIR FORCE, et al.,**

   Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motion to Dismiss Complaint in Part, filed February 08, 1999 (Doc. No. 46). The Court has reviewed the motion, the memoranda submitted by the parties, and the relevant authorities. The Court finds that the motion is well taken and GRANTS the Motion to Dismiss Claims Seven, and Eleven through Fourteen.

## I. BACKGROUND

### A. Facts and Procedural History

On September 8, 1998, Plaintiffs[1] filed a 15 claim complaint (Doc. 1) against Defendants, United States Air Force et al., and amended the complaint on December 1, 1998 (Doc. 36). The amended complaint seeks judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 702, and the National Environmental Protection Act (NEPA), 42 U.S.C. §§ 4321-4370, of the Air Force's final environmental assessment Proposed Airspace Modifications to Support

---

[1] Plaintiffs in this case are various land owners and ranchers living in the vicinity of the Air Force base.

Units at Holloman Air Force Base ("ALCM/Talon MOA EA") and Finding of No Significant Impact ("FONSI").  Plaintiffs also seek judicial review of the final environmental impact statement Proposed Expansion of the German Air Force ("GAF") Operations at Holloman AFB ("GAF Beddown EIS").  Further, Plaintiffs incorporate a Federal Aviation Act ("FAA") claim, a Noise Control Act claim, a Transportation Act claim, a Fifth Amendment claim, several tort claims, and a civil rights claim under U.S.C. §§ 1981 and 1983.  Essentially, however, all of Plaintiffs' claims revolve around:  (1) the USAF's proposal to modify airspace to support extra units at Holloman AFB, and (2) its proposal to expand the GAF operations at Holloman AFB.  Except for the civil rights claim, all claims seek equitable relief.

After relocating 12 GAF Tornado aircraft, the Air Force proposed to consolidate six existing military training routes ("MTRs") in southeast New Mexico and West Texas, originally established for Air Launched Cruise Missile ("ALCM") flights.  The ALCM/Talon MOA EA and FONSI examined the proposal to modify existing airspace by consolidating several MTRs.  The proposed airspace modifications would also permit an aerial refueling track (allowing refueling of aircrafts as low as 1000 feet), increase the overall number of military flights, and expand the existing Talon military operations area ("MOA") – all of which affect Plaintiffs' land.

The GAF Tactical Training Establishment ("TTE") at Holloman AFB was established by a Memorandum of Understanding ("MOU") signed in May 1994.  This agreement, coordinated by the Department of Defense through the Department of State, authorized the GAF to conduct Tornado aircrew training and flight operations at Holloman AFB and acknowledged the intent of the USAF and GAF to enter into a relationship beyond the year 2005.  The MOU required the GAF to operate within the authority of all federal rules and regulations, except that it authorized

the GAF to fly very-low-level flights at 100 feet above ground level ("AGL") during the day and 200 feet AGL at night.

In May 1996, the GAF activated the Tactical Training Center ("TTC") at Holloman and have been training in southeastern New Mexico in Tornado aircraft since. The training has included terrain following, and low altitude training sorties. The GAF train in the vicinity of Holloman AFB on a variety of MTRs and in several MOAs, including several Instrument Routes ("IR") which transit over some of Plaintiffs' private property and leased allotments. The TTE serves as the parent command for the two German aircrew training squadrons. The GAF Beddown EIS examined Defendants' proposal to expand the GAF TTE at Holloman AFB by adding 30 Tornado aircraft and 640 personnel.

Defendants' Motion to Dismiss Complaint in Part, now before the Court, moves to dismiss the following claims: Seventh (Transportation Act), Ninth (Fifth Amendment); Eleventh (trespass); Twelfth (nuisance); Thirteenth (intentional misrepresentation); Fourteenth (negligent misrepresentation); and Fifteenth (civil rights). On September 3, 1999, this Court held a hearing on the respective motions. *See* Transcript of the Proceedings ("Transcript"). After hearing arguments from both parties, the Court dismissed Count 9. In addition to Count 9, the Court does not consider Count 15 at this time, because both parties agreed it was to be amended. This opinion, therefore, only addresses Claims Seven and Eleven through Fourteen.

## II. DISCUSSION

### A. Claim Seven – Transportation Act

In their Seventh Claim for relief, Plaintiffs assert that Defendants failed to address the federal policies set forth in Section 4(f) of the Department of Transportation Act[2] in its NEPA evaluations[3], thereby rendering the NEPA evaluations invalid. Plaintiffs argue that the Air Force's decision to expand the military airspace necessarily invoked a review by the Department of Transportation, through the FAA. They allege this review compelled the Air Force to consider Section 4(f) in its NEPA evaluations.

The regulations implementing NEPA require the environmental analysis to include an assessment of ". . . possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned." 40 CFR § 1502.16(c). Section 4(f) of the Transportation Act provides:

> The Secretary [of Transportation] may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if –
> (1) there is no prudent and feasible alternative to using that land; and
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

Plaintiffs argue that, because Defendants did not consider the requirements of Section 4(f) in their NEPA environmental assessment, they did not discuss *all* possible conflicts between the proposed

---

[2] Section 4(f) of Pub. L. No. 89-670, 1966 is now codified at 49 U.S.C. § 303.

[3] The NEPA evaluations include the ALCM/Talon MOA EA, the FONSI, and the GAF Beddown EIS.

expansion of the military airspace and federal policies and, therefore, Defendants' NEPA evaluations were invalid. (Doc. 36, 27-28).

The Court rejects this conclusion and finds that Defendants did not violate NEPA by failing to consider Section 4(f), because Congress never intended Section 4(f) to apply to military airspace modification proposals and the Air Force had no precedent to consider military airspace modification proposals to be covered by Section 4(f).

The Court finds Defendants did not violate their NEPA obligations because Congress did not intend the Air Force's proposed modifications of airspace to constitute a "transportation program or project" within the purview of the statute, which explains why, historically, military airspace modifications have never been subjected to a Section 4(f) examination. This finding is supported by Public Law 105-85, which Congress enacted in November of 1997. The amendment states: "[n]o military flight operation (including a military training flight), or designation of airspace for such an operation, may be treated as a transportation program or project for purposes of Section 303(c) of title 49, United States Code." Pub. L. 105-85, Div. A, Title X, § 1079, 11 Stat. 1916 (1997). This statutory amendment and its legislative history conclusively demonstrate that Congress never intended proposed modifications to Air Force airspace to fall under Section 4(f)'s "transportation program or project" requirement, and that there is no precedent of treating this type of airspace modification under Section 4(f).

According to the legislative history to the amendment, there is no factual or legal basis to apply Section 4(f) to military airspace proposals. S. Rep. No. 105-29, at 329 (1997). The Senate Report states explicitly: "[t]he FAA application of section 4(f) to military airspace proposals is not consistent with the congressional intent associated with the enactment of the Transportation Act

of 1966." Id. at 329.  Thus, there is no indication Section 4(f) was ever intended to encompass this type of military airspace modification proposal.  To the contrary, the statute and its legislative history firmly establish that Section 4(f) was never intended to include military airspace modifications within its review.

Besides the fact Congress never intended Section 4(f) to apply to military airspace proposals, Defendants also effectively point out there is no evidence the Air Force or the FAA has ever considered proposed modifications to a military operation area to fall under Section 4(f) (Transcript, at 5) (Doc. 51, at 3-4).  Since the Air Force had never treated this type of proposal as falling within Section 4(f) in the past, and this approach had never been questioned, there was no reason for the Air Force to consider Section 4(f) as a possible conflict with federal policy and treat it in their NEPA evaluations.  Again, this is reinforced by the legislative history to Section 4(f)'s amendment.  The Senate Report explains the military exception was proposed because of "an *unprecedented* assertion by the Federal Aviation Administration that Section 4(f) . . . applies to military airspace proposals."  S. Rep. No. 105-29, at 328 (emphasis added).  This passage fully substantiates Defendants position that, prior to the unprecedented assertion, neither the Air Force nor the FAA had ever considered proposed modifications to a military operation area to fall under Section 4(f).  In fact, the legislative history indicates the amendment was enacted precisely to clarify this misunderstanding, after the *unexpected* FAA attempt to apply Section 4(f) to a proposed military airspace modification.

Plaintiffs' essential argument against all of the Court's findings is that the Court should accept a different interpretation of the significance of the enactment of Section 4(f)'s amendment.  In the Hearing on the Motions to Dismiss, Plaintiffs argued that the very fact Congress chose to

enact the amendment to exempt military airspace modification proposals, supports Plaintiffs' position that, prior to the amendment, Section 4(f) covered this type of Air Force proposal. (Transcript, at 7-8). According to this argument, because Defendants' NEPA evaluations were issued in June, 1997, and the amendment to the statute was passed in November, 1997, at the point in time when Defendants acted (issuing the environmental reports) they were still within the coverage of the pre-amendment statute. (Doc. 50, at 7). Therefore, rather than being important for revealing Congressional intent regarding military airspace modifications, the amendment and the timing of the amendment to Section 4(f), are significant because they establish that the statute, in its pre-amendment form, *did* cover military airspace modifications. Thus, when Defendants failed to include a Section 4(f) examination in their environmental assessments – assessments issued six months before the amendment exempted military airspace modifications from Section 4(f) – Defendants violated their NEPA requirements.

The Court is not persuaded by Plaintiffs that the enactment of the amendment establishes that pre-amendment Section 4(f) covered military airspace modifications. The Court finds the amendment, at most, demonstrates that prior to the amendment there was a *potential* uncertainty, or lack of clarity, about whether Section 4(f) covered military airspace modifications. The uncertainty[4] was potential because no one ever asserted Section 4(f) covered military airspace

---

[4]Plaintiffs want to argue there was no uncertainty, and Defendants must have known all along that military airspace modifications were covered by Section 4(f). In response to a question by the Court over whether the FAA *ever* had the authority to require the Air Force to submit to a Section 4(f) analysis, counsel for Plaintiffs explained:
> I think it's been sitting there. I mean, the Department of Transportation Act which is codified at 303(c), Section 4F, was passed in 1966. Thirty-one years later, a modification exclusion for these kinds of programs is passed by Congress. And I ask rhetorically, then, if it's because that the Air Force never paid any attention to it and realized now that they have an obligation to do so, or that they did pay attention to it and now want to come out from under it. One way or another, after 31 years, it must have

modifications, and there was absolutely no indication Congress intended it to do so. The fact this lack of clarity existed does not mean Section 4(f) must have covered military airspace modifications prior to the amendment. Instead, when this potential uncertainty became an actual controversy – that is, at the first hint the FAA might try to subject military airspace modifications to a Section 4(f) examination – Congress immediately amended Section 4(f) to clarify that the section did not apply to such projects. The amendment, then, did not alter Section 4(f) by removing military airspace modifications from its original coverage. Rather, it clarified what Congress intended all along by definitively excluding military airspace modifications from Section 4(f)'s coverage.

In conclusion, the Court finds that even if Section 4(f) was applied to Defendants, they were not in violation of NEPA requirements by failing to include a Section 4(f) discussion because Congress did not intend for military airspace modifications to fall under the section and because there is no precedent to treating this type of proposal under Section 4(f). For this reason, the Court finds Claim Seven should be dismissed.

### B. Claims Eleven through Fourteen – Torts

In Claims Eleven through Fourteen, Plaintiffs assert Defendants have committed various common law torts, and request equitable relief. Specifically, in Claims Eleven and Twelve, Plaintiffs accuse Defendants of trespass and nuisance for low-level flights over their property, and

---

been considered. (Transcript, at 7-8)
However, apart from Plaintiffs' assertion that it *must* have been the case that the Air Force considered Section 4(f) one way or the other, there is no evidence this actually was the case. The legislative history firmly supports the conclusion that Section 4(f) has never been intended nor treated as covering military airspace modifications, and the FAA itself went many years without advancing its claim to such jursidction.

seek to enjoin future flights. They assert jurisdiction for these claims and Defendants' waiver of sovereign immunity under the APA, 5 U.S.C. § 702. In Claims Thirteen and Fourteen, Plaintiffs accuse Defendants of intentional and negligent misrepresentation based on alleged misstatements by Defendants about the effects and extent of the flights in the past, and they request a writ of mandamus prohibiting future misrepresentations. They assert jurisdiction for these claims under the APA and the federal Mandamus Act, 28 U.S.C. § 1361, and waiver of Defendants' sovereign immunity under the APA.

### 1. Background

The parties are well aware of the limitations placed on lawsuits brought against the federal government. Under the doctrine of sovereign immunity, "the United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." Weaver v. United States, 98 F.3d 518, 520 (10th Cir. 1996) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)). The threshold question in any suit in which the United States is a defendant, then, must be whether Congress has specifically waived sovereign immunity. Taylor v. United States, 590 F.2d 263 (8th Cir. 1979). In this case, Plaintiffs rely on the APA to waive Defendants' sovereign immunity.

In relevant part, the APA states:

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority *shall not be dismissed nor relief therein be denied on the ground that it is against the United States*

> *or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . .* 5 U.S.C. § 702 (emphasis added).

As Plaintiffs point out, the APA permits a person suffering a legal wrong due to an agency's final decision[5] to have judicial review of such agency action, and it specifically waives sovereign immunity for equitable claims (Doc. 50, at 10). Plaintiffs argue that because they are challenging a final decision of the Air Force (the decision to go ahead with the airspace modifications based on the ALCM/Talon MOA EA, FONSI and GAF Beddown EIS reports), and because they are seeking injunctive relief rather than damages, the Court has jurisdiction over their common law tort claims under the APA.

The Court finds Plaintiffs' four tort claims cannot be heard by the Court under the APA. First, the Court finds the APA does not provide the necessary jurisdiction for the Court to entertain these common law tort claims. Second, and independently, the Court finds these claims are specifically excluded by the APA's own limitation on its waiver of sovereign immunity. Finally, the Court notes the Mandamus Act neither provides a waiver of sovereign immunity, nor an independent basis for jurisdiction for Plaintiffs' misrepresentation claims. Therefore, to the extent these four common law tort claims attempt to assert claims separate and distinct from a judicial review of agency action, the Court finds they should be dismissed.[6]

---

[5]The "final" agency action language stems from § 704 of the APA, which refines the type of actions reviewable.

[6]Plaintiffs' Response Motion suggests they *are* attempting to raise separate claims – "[h]ere Plaintiffs allege causes of action . . . which are independent of the NEPA claims . . ." (Doc. 50, at 10). If these claims are not an attempt to raise separate claims from a review of agency action under the APA, they should also be dismissed. Plaintiffs' Claims 1– 6 already seek judicial review of the Air Force's final NEPA evaluations under the APA's "arbitrary and capricious" standard. To the extent, then, that Claims 11– 14 merely seek judicial review of the Air Force's decisions, they do not differ from Claims 1– 6, and are therefore unnecessary.

## 2. APA is Inapplicable

### a. *No Independent Basis for Jurisdiction*

The first difficulty for Plaintiffs' tort claims is that there is no jurisdiction for these claims under the APA. Simply stated, the APA does not create a cause of action which provides jurisdiction to the Court for common law tort claims against the Government. Although the APA does allow injunctive relief to evaluate certain agency decisions, "the APA does not create an independent grant of jurisdiction for the review of agency actions." Fostvedt v. United States, 978 F. 2d 1201, 1203 (10th Cir. 1992) (citing Eagle-Picher Indus., Inc. v. United States, 901 F. 2d 1530, 1532 (10th Cir. 1990)). Since Plaintiffs are unable to demonstrate any substantive basis for jurisdiction under the APA, their common law tort claims should be dismissed.

As discussed above, Plaintiffs contend their tort claims are properly under the APA because the Plaintiffs are seeking equitable relief and the APA waives sovereign immunity for suits seeking injunctive relief. (Doc. 50, at 10).[7] They argue that their request for injunctive relief under the APA is appropriate because Defendants' "*constitutional* violations come within the terms of federal question jurisdiction. Specifically, 20 U.S.C. § 1331, and § 702 of the APA 'provides a corresponding waiver of sovereign immunity.'" (Id., at 11) (emphasis added). Plaintiffs are correct in stating that alleged constitutional violations based on agency action fall within federal question jurisdiction, and federal courts have jurisdiction over such claims as a result of the corresponding waiver of sovereign immunity by the APA. In fact, any violation that

---

[7]In their Response Motion, Plaintiffs appear to ground their claims exclusively on this point. There is no question injunctive relief is a prerequisite to an APA claim. Furthermore, neither party argues Plaintiffs are seeking anything other than injunctive relief in these four claims. Plaintiffs seem to believe, however, that because these two points are true, this somehow demonstrates their claims are properly under the APA. This is not the case. While it is true that in order to raise a claim under the APA a party must seek injunctive relief, this does not mean that if a party seeks injunctive relief the party's claim is, therefore, properly under the APA.

comes within the terms of federal question jurisdiction, combined with the waiver of sovereign immunity from the APA, allows a district court to review the claim. The Plaintiffs' difficulty with their tort claims, however, is they fail to present any evidence these claims fall within the federal question statute. Despite Plaintiffs' assertion that they are alleging constitutional violations[8], the Court finds no indication the underlying claims involve constitutional violations, or even that Plaintiffs are truly asserting them as constitutional violations.

The federal question statute, 20 U.S.C. § 1331, provides: "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." The cases Plaintiffs cite to support their jurisdictional claim, all had claims with issues that unquestionably fell within the federal question statute.[9] There was good reason, then, for the courts in these cases to find the APA and federal question statute provided subject matter jurisdiction and a waiver of sovereign immunity.

In stark contrast to the claims in the above cases, the tort claims in this case do not fall under the federal question statute. In Plaintiffs' Claims 11-14, the causes of action are all based on *common law* torts – trespass, nuisance, and misrepresentation. The mere statements that the claims allege constitutional violations does not invest such claims with a Constitutional basis, and Plaintiffs provide no argument or evidence to support this assertion. Unlike the plaintiffs in the cases Plaintiffs cited to, they are unable to articulate violations of any specific Constitutional sections. They are unable to do so because there are no Constitutional provisions that provide

---

[8]*See* Doc. 50. at 10. Plaintiffs request relief for "*constitutional* violations;" and explain "[h]ere, Plaintiffs allege causes of action based on federal *constitutional* violations . . ." (emphasis added).

[9]*See*, e.g., Hahn v. United States, 757 F.2d 581, 588 (3rd Cir. 1985) (plaintiffs' claim for injunctive relief based on alleged violation of 5th Amendment rights); and Lawrence v. United States, 631 F. Supp. 631 (E.D.Pa. 1982) (plaintiffs' claim for injunctive relief based on alleged violation of First Amendment rights).

relief for these claims. Rather, Claims 11-14 assert violations of common law torts -- trespass, nuisance, and misrepresentation. In fact, Plaintiffs, themselves, appear to regard Claims 11-14 as common law torts. Belying their earlier assertion that the four tort claims involve constitutional violations, Plaintiffs later explain they are seeking equitable relief rather than compensatory damages "under any of the *common law* causes of action." (Id., at 19) (emphasis added)[10].

In a case presenting a similar question to the one at bar, the district court in Alabama arrived at the same conclusion as this Court does. In United States v. Olin, 606 F.Supp 1301, (N.D. Ala. 1985), the plaintiffs brought suit against a corporation and the U.S. Government, seeking injunctive relief for a continuing public and private nuisance. The plaintiffs argued they were entitled to injunctive relief under the APA. Like Plaintiffs, the plaintiffs in Olin did not argue they were within the purview of FTCA or another federal statute. Instead, they argued they were entitled to injunctive relief against the Government under the APA, and the court had jurisdiction under 28 U.S.C. § 1331. 606 F. Supp. at 1311.

The court examined the plaintiffs' claim and the cases they cited and concluded:

> in cases cited by plaintiffs where the plaintiffs alleged jurisdiction pursuant to the APA and 28 U.S.C. § 1331, the underlying complaints were premised on either a federal statutory or constitutional claim. [citations omitted]. Clearly, there is a distinction between alleging jurisdiction under these statutes based on a federal question and on tort. Id. at 1312.

In other words, the court concluded that, despite the plaintiffs' plain assertion that the court had jurisdiction over their nuisance claim under federal question statute, there was no support for this

---

[10]Plaintiffs also claim, near the beginning of their discussion of Claims 11-14, that "Plaintiffs are not seeking monetary relief or compensation for any of their *common law causes of action*." (Doc. 50, at 10) (emphasis added).

position. The court correctly concluded it had no jurisdiction, because the APA and § 1331 do not provide jurisdiction for a federal court to review the common law nuisance claim.

Plaintiffs' Claims 1-6 seek judicial review of the Air Force's final NEPA evaluations. Claims 1-6 do not suffer the same jurisdictional problems, because the allegations against Defendants involve violation of a federal statute (NEPA). Unlike Claims 1-6, and unlike the claims involved in the cases Plaintiffs cite to, the allegations of violations of the common law torts of nuisance, trespass, and misrepresentation do not implicate any federal statutes or the Constitution. Since the APA is not an independent grant of jurisdiction, and Plaintiffs have failed to provide any Constitutional basis for jurisdiction over the tort claims, the Court finds it has no jurisdiction to hear Claims 11-14 and they should be dismissed.

### b. *FTCA Implicitly Forbids the Relief Sought*

The second, and independent, problem for Plaintiffs is the APA specifically excludes its waiver of sovereign immunity for these tort claims. Thus, even if Plaintiffs had been able to demonstrate an independent basis for jurisdiction for their tort claims, which they were not, these claims cannot be brought under the APA, because the APA specifically excludes them. After delineating its waiver of sovereign immunity, the APA states "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Federal Torts Claims Act (FTCA), 28 U.S.C. 1346(b), 2671-2680, provides the exclusive remedy for suits against the Government or its agencies sounding in tort. Since the FTCA provides exclusive relief for tort claims against the

Government and its agencies, it implicitly forbids the relief sought by Plaintiffs, therefore, Plaintiffs' tort claims cannot be brought under the APA.

The FTCA allows private parties to sue the Government and its agencies for violations of certain torts, while it precludes relief under others. 28 U.S.C. § 2680(h). Furthermore, the statute waives the Government's sovereign immunity and allows for the recovery of damages, but not for injunctive relief. Plaintiffs believe their claims are not covered under this statute. (Doc. 50, at 10). They argue that their amended complaint makes it clear they are not seeking monetary relief for their tort claims, "[c]onsequently, the Federal Torts Claims Act is . . . not applicable here . . . In fact, the reason Plaintiffs did not bring an action under the Tort Claims Act for compensatory damages is that the Tort Claims Act precludes claims for injunctive relief." (Id., at 11, 19). In other words, Plaintiffs argue that since they are seeking injunctive relief for their tort claims, and the FTCA does not allow injunctive relief against tort claims, there is no adequate remedy for their claims. Accordingly, these claims are properly before the Court under the APA.

Plaintiffs are correct that the APA is only available if no adequate remedy is available elsewhere[11], and they are also correct that the FTCA does not allow injunctive relief against tort claims. These two findings, however, do not produce the conclusion that the tort claims are

---

[11]The APA also requires that actions have "no other adequate remedy." 5 U.S.C. § 704. Since the Court finds: (1) there is no jurisdiction for Plaintiffs' tort claims under the APA; and (2) these tort claims are specifically excluded from the APA's waiver of sovereign immunity, the Court has no occasion to determine whether adequate remedies are available elsewhere. The Court notes, however, Plaintiffs' own arguments strongly suggest remedies are available, but that they desire other remedies – Plaintiffs, upset with the effects of the flights over their property, want the flights *stopped*, not money damages for the resulting harm. *See*, e.g., Transcript at 29:
> THE COURT: Well, what damages could they not be compensated for? If the ranch becomes useless, then it seems to me that the government is obligated to write a check for the value of the ranch.
> MR. BOND: I guess you're right, Your Honor. But we have a series of people there, and a bunch of plaintiffs, some of who have been on that property for well over 100 years.

properly before the Court under the APA. Instead, the APA's specific exclusion of this type of claim -- whose relief is expressly or impliedly forbidden by another statute -- prevents the Court from considering these torts under the APA.

The case law on the application of the APA to injunctive relief for tort claims is relatively scarce. However, to the extent courts have considered the matter, they have almost unanimously found "[t]he FTCA is the exclusive remedy for actions sounding in tort . . ." Peak v. Small Business Administration, 660 F.2d 375, 377 (8th Cir., 1981).[12] In United States v. Olin, 606 F.Supp 1301, as discussed above, the district court considered whether the plaintiffs could assert jurisdiction for their common law nuisance claim. The Court concluded: "[t]he Tort Claims Act is the exclusive remedy for claims sounding in tort [citation omitted] and the APA confers no jurisdiction on this court to grant relief where another statute expressly or impliedly forbids the relief which is sought, as does the FTCA in this case." 606 F. Supp. at 1312.

This analysis of the interplay of the FTCA and APA makes sense. As the Court has previously discussed, the United States, as sovereign, is immune from suit except to the extent Congress has expressly given its consent. Sherwood, 312 U.S. at 587-88. Furthermore, any waiver of sovereign immunity is to be strictly construed. Dry Creek Lodge, Inc. v. United States, 515 F.2d 926 (10th Cir. 1975). The narrow approach to sovereign immunity means the "make-whole relief inherent in much of the common-law tradition does not apply in the context of actions brought against the United States. To the contrary, a suit against the United States must

---

[12]*See also* Bor-Son Bldg. Corp. v. Heller, 572 F.2d 174, 177 (8th Cir. 1978) ("[a]s to claims sounding in tort, the remedy under the Federal Torts Claims Act is exclusive . . ."); 14 C. Wright, et al., Fed. Prac. & Proc. Juris. 3d § 3658 ("[t]he Federal Torts Claims Act is also the exclusive remedy against the United States for claims sounding in tort . . .").

start from the opposite assumption that no relief is available. [citation omitted]." Tucson Airport Authority v. General Dynamics Corp., 136 F.3d 641, 644 (9th Cir. 1998). By enacting the FTCA, Congress sought to delineate specific circumstances under which the United States would waive its sovereign immunity to be sued for tort claims. While not expressly stating as much, the clear implication of the FTCA, in addressing tort causes of action and providing a specific form of relief for tort claims against the Government, was that the statute was intended to provide the Governments' exclusive waiver of sovereign immunity with respect to tort claims against it.

The Court finds that, in enacting the FTCA, Congress considered the ramifications of tort suits against the Government, chose to waive the Government's sovereign immunity for suits alleging money damages, and only chose to waive the Government's immunity for certain torts. The fact Congress excluded certain torts from this waiver of sovereign immunity does not allow parties to seek injunctive relief for the excluded torts. To the contrary, the exclusions preclude *any* relief for those torts – money relief is excluded explicitly by the FTCA's enumerated exclusions; and, equitable relief is excluded implicitly by not allowing equitable relief under the FTCA at all. The Court finds this analysis also fits with the rationale of the APA, whose "purpose is to provide an administrative forum for those challenging administrative and regulatory agency action, not to provide a forum for adjudicating government tort liability." Doe v. Attorney General of the United States, 941 F.2d 780, 793 (9th Cir. 1991).

In conclusion, the Court finds the FTCA provides the exclusive remedy for all claims sounding in tort. Thus, the Court agrees with the Eighth Circuit: "if no recovery is allowed under the FTCA for an action sounding in tort, there is simply no remedy afforded." Peak, 660 F.2d at 378. Since the FTCA does not allow for injunctive relief for any torts, and it is the exclusive

remedy for actions sounding in torts, the FTCA implicitly forbids the relief which Plaintiffs seek under the APA. For this reason Plaintiffs' tort claims should be dismissed.

### 3. Mandamus Request Inapplicable Without APA

In Claims Thirteen and Fourteen, Plaintiffs allege that Defendants negligently or intentionally misrepresented the nature or extent of the air flights over Plaintiff's property. Plaintiffs seek a writ of mandamus to prohibit the Air Force from continuing its misrepresentations. Although the Court has already determined that Plaintiffs' tort claims should be dismissed under the APA, it is necessary to note that the mandamus statute, cited as an additional basis for jurisdiction, does not remedy the above problems for these two claims. In this case, without the APA to provide a waiver of sovereign immunity or an independent jurisdictional basis, Plaintiffs' mandamus requests fail.[13]

It is undisputed that without the APA, Plaintiffs have no waiver of sovereign immunity, because the Mandamus Act does not waive sovereign immunity. New Mexico v. Regan, 745 F.2d 1318, 1321 (10th Cir. 1984); Fostvedt v. U.S., 98 F.2d 1201, 1202 (10th Cir. 1992). Without a waiver of sovereign immunity, Plaintiffs' mandamus claims cannot proceed. Since the APA is

---

[13] It is important to recognize that "[h]istorically, mandamus is an extraordinary remedial process awarded only in the exercise of sound judicial discretion. Before such a writ may issue, it must appear that the claim is clear and certain and the duty of the officer involved must be ministerial, plainly defined, and peremptory." Prairie Band of the Pottawatomie Tribe of Indians v. Udall, 355 F.2d, 364, 367 (10th Cir. 1966). *See also*, Ortiz v. U.S., 661 F.2d 826, 831 (10th Cir. 1981) ("[m]andamus relief is proper only where the functions constitute clearly defined, peremptory, ministerial duties of a government official owed to a complainant. [citation omitted]."). Since the Court finds there is no waiver of sovereign immunity or independent jurisdictional grounds for the mandamus relief sought, the Court has no occasion to examine whether Plaintiffs have demonstrated the necessary elements to justify the use of the extraordinary remedy of mandamus, or to consider the troubling First Amendment implications of Plaintiff's request that the Court mandate what the Air Force can and cannot say.

inapplicable, there is, then, no waiver of sovereign immunity for Plaintiffs' mandamus claims, and they should be dismissed.

In addition to the sovereign immunity difficulty for Plaintiffs' mandamus claims, the two claims also fail because there is no independent ground for jurisdiction. Although the Mandamus Act does provide jurisdiction for district courts to compel an officer of the Government to perform a duty owed to the plaintiff, this statutory provision "does not provide an independent basis for jurisdiction." Starbuck v. City and County of San Francisco, 556 F.2d 450, 459 (9th Cir. 1977).[14] In other words, the statute can only be used after the court already possesses an underlying basis for jurisdiction – the statute "merely supplies a permissible remedy in actions otherwise properly brought on independent jurisdictional grounds." Colburn, 414 F.Supp. at 193 (citing Udall v. Oil Shale Corp., 406 F.2d 759 (10th Cir. 1969); Prairie Band of Pottawatomie Tribe of Indians v. Udall, 355 F.2d 364 (10th Cir. 1966)). Since the APA is inapplicable, there is no underlying basis of jurisdiction which allows the Court to consider the mandamus remedy, so the mandamus claims should, therefore be dismissed.

## ORDER

For all the reasons stated above, this Court finds: first, Plaintiffs failed to establish that Defendants violated Section 4(f); and second, Plaintiffs' tort claims are not properly under the APA because there is no jurisdiction and they are specifically excluded. Therefore, Claim Seven and Claims Eleven through Fourteen are properly dismissed.

---

[14]*See also*, Craig v. Colburn, 414 F.Supp. 185, 193 (D.Kan. 1976) (the Mandamus Act "does not confer an independent basis of jurisdiction . . ."); Andrean v. Secretary of the United States Army, 840 F. Supp1414, 1420 (D.Kan. 1993).

-19-

IT IS HEREBY ORDERED that Defendants' Motion to Dismiss Complaint in Part, with respect to Claims Seven, and Eleven through Fourteen (Doc. 49) be, and hereby is, GRANTED.

Dated at Albuquerque this 18th day of November, 1999.

_____
BRUCE D. BLACK
United States District Judge

**Attorneys:**

**For Plaintiff**
Frank M. Bond
Simons, Cuddy & Friedman
P.O. Box 4160
Santa Fe, New Mexico 87502-4160

**For Defendant**
John W. Zavitz
Assistant U.S. Attorney
P.O. Box 607
Albuquerque, New Mexico 87103