# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CHARLIE LEE, et al.,**

      Plaintiffs-Petitioners,

v.                                    No. CIV 98-1056 BB/KBM-ACE

**UNITED STATES AIR FORCE, et al.,**

      Defendants-Respondents.

## MEMORANDUM OPINION
## DENYING PETITIONERS' APPEAL FROM
## THE UNITED STATES AIR FORCE'S FINAL AGENCY DECISION

**THIS MATTER** comes before the Court on the plaintiffs-petitioners' ("Petitioners") appeal from a final agency decision whereby the defendants-respondents ("Respondents") permitted the German Air Force to expand its military training exercises at Holloman Air Force Base.  The Court has examined the parties' submissions (Docs. 103, 128, and 132) and the relevant legal authorities, and, for the reasons set forth below, finds that the final decision is supported by substantial evidence and is neither arbitrary, capricious, nor the byproduct of an abuse of discretion and, therefore, Petitioners' appeal will be **DENIED** and the final decision will be **AFFIRMED**.

## I.
## FACTUAL BACKGROUND

In May 1994, the United States Air Force ("USAF") and Germany's Federal Ministry of Defense ("FMOD") entered into an agreement ("Agreement"), wherein the United States authorized the German Air Force ("GAF") to beddown twelve GAF Tornado aircraft at Holloman Air Force

Base ("original beddown").[1]  See Administrative Record, volume 1, book 5, page 1943, appendix A.[2]

The Agreement mandates that the GAF abide by the same federal aviation rules, regulations, directives, and procedures as the USAF.  See Agreement at 3, ¶ 3.  Pursuant to the Agreement, the GAF implemented the original beddown at Holloman Air Force Base ("HAFB") in May 1996.  See ALCM/Talon MOA EA at S-1.  The GAF has been performing military training exercises in southeastern New Mexico ever since.

Two years after the original beddown's environmental assessment was completed, the USAF proposed to modify and realign certain airspace to support USAF and GAF units located at HAFB.  See Administrative Record, volume 1, book 4 at 1512.  The USAF's initiative proposed to consolidate certain military training routes ("MTRs"),[3] establish an aerial refueling anchor, increase the number of military flights, and expand existing Talon military operations area ("MOA")[4] in southeastern New Mexico.  See ALCM/Talon MOA EA at S-1.  The proposal's impact on the

---

[1]  The original beddown's potential impact on the environment was assessed under the National Environmental Policy Act ("NEPA") and USAF regulations in February 1993, more than one year before the USAF and the FMOD executed the Agreement.  See Proposed Airspace Modifications to Support Units at Holloman Air Force Base, N.M. ("ALCM/Talon MOA EA") at 1-4.  The environmental assessment for the original beddown resulted in a finding of no significant impact ("FONSI").  See id.

[2]  The Agreement, which begins at Administrative Record, volume 1, book 5, page 1943, appendix A, is not individually Bates-stamped.  Therefore, when the Court references material within the Agreement, it will use the following convention:  Agreement at __ (page number).  The "page number" appears at the bottom-center of each respective page.

[3]  "A[n] MTR is a long, low-altitude corridor that serves as a flight path to a particular destination.  A standard MTR usually ranges from 500 feet to 1,500 feet above ground level.  MTRs are designed to provide military pilots with training routes to practice navigational skills over a variety of terrain types . . . ."  Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1030  (10th Cir. 2001) (internal quotation omitted)

[4]  "MOAs are larger expanses of airspace designed to accommodate a wide variety of nonhazardous military flight training maneuvers.  The size of a[n] MOA depends on the types of air maneuvers that occur within the MOA.  The maximum altitude for a[n] MOA is 17,999 feet above mean sea level.  MOAs are not created to prevent access by other aircraft, but rather to show civil aircraft pilots where nonhazardous military flight training may be taking place."  Custer County Action Ass'n, 256 F.3d at 1030 (internal quotation omitted)

environment was analyzed in the ALCM/Talon MOA EA. The ALCM/Talon MOA EA resulted in a FONSI, which was executed in June 1997. <u>See</u> Administrative Record, volume 1, book 4 at 1512.

In May 1998, the USAF and the FMOD amended the Agreement ("Amended Agreement"), wherein the United States authorized the GAF to beddown thirty additional GAF Tornado aircraft at HAFB ("proposed beddown"). <u>See</u> Amended Agreement, attached as exhibit 10 to Petitioners' opening brief. The USAF analyzed the proposed beddown's impact on the environment in a final environmental impact statement ("GAF Beddown EIS").[5] Based on the information contained in the GAF Beddown EIS, the USAF entered a final decision ("Record of Decision") approving the proposed beddown in May 1998. <u>See</u> Administrative Record, volume 1, book 7 at 2081-93.

Petitioners now seek judicial review under the Administrative Procedure Act, 5 U.S.C. § 702 <u>et</u> <u>seq.</u>, and NEPA, 42 U.S.C. § 4321 <u>et</u> <u>seq.</u>, of the USAF's final decision and the underlying environmental impact statement. <u>See</u> <u>generally</u> Petitioners' third amended complaint ("complaint"). In their complaint, Petitioners claim that the Record of Decision, the GAF Beddown EIS, the ALCM/Talon MOA EA, and the original beddown's environmental assessment violate <u>inter alia</u> NEPA and the Noise Control Act.

## II.
## STANDARD OF REVIEW

The Court's review of Petitioners' administrative appeal from the USAF's final decision is limited to determining: (1) whether the USAF acted within the scope of its authority; (2) whether the USAF complied with prescribed rules and procedures; and (3) whether the USAF's final decision

---

[5] The GAF Beddown EIS, which begins at Administrative Record, volume 1, book 5, page 1943, is not Bates-stamped. Thus, when the Court references material within that statement, it will use the following convention: GAF Beddown EIS at __ (page number). The "page number" appears at the bottom-right of each respective page.

is otherwise arbitrary, capricious, or an abuse of discretion. See 5 U.S.C. § 706(2)(A); see also

Olenhouse, 42 F.3d at 1560. An agency's final decision is arbitrary and capricious if the agency relied

upon:

> factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Colorado Environmental Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999) (quotations

omitted). While the Court must carefully scrutinize the USAF's decision, "the ultimate standard of

review is a narrow one." Custer County Action Ass'n, 256 F.3d at 1030 (quotations omitted).

This Court must accept the USAF's factual findings if supported by substantial evidence. See

id. The substantial evidence standard precludes this Court from displacing the USAF's "choice

between two fairly conflicting views, even though the court would justifiably have made a different

choice had the matter been before it de novo." Arapahoe County Public Airport Authority v. F.A.A.,

242 F.3d 1213, 1218 (10th Cir. 2001) (internal quotation omitted).

### III.
### DISCUSSION

Petitioners claim the USAF's final decision and the underlying environmental impact statement

violate NEPA and its implementing regulations because: (A) the USAF failed to adequately prepare

the GAF Beddown EIS, (B) the USAF failed to adequately consider reasonable alternatives to the

proposed beddown at HAFB, (C) the USAF failed to adequately consider cumulative effects or

connected actions, (D) the USAF failed to adequately address economic and environmental impacts,

and (E) the USAF failed to include within the GAF Beddown EIS an adequate statement of purpose

and need. In reviewing those claims, the Court will limit its examination to whether the USAF

provided in the GAF Beddown EIS a reasonable, good faith, objective presentation of the topics NEPA requires a final environmental impact statement to cover. See Custer County Action Ass'n, 256 F.3d at 1035. The Court will not "fly speck" the GAF Beddown EIS but will instead make a pragmatic judgment whether its "form, content, and preparation foster both informed decision-making and informed public participation." Id. (internal quotation omitted).

## A.      Adequate Preparation

Federal agencies like the USAF must prepare an environmental impact statement for any proposed action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C)(i).  An environmental impact statement must discuss reasonably foreseeable effects associated with the proposed action. See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1526 (10th Cir. 1992).  However, in doing so, the impact statement need only "furnish such information as appears to be reasonably necessary under the circumstances for evaluation of the project." Sierra Club v. Marsh, 976 F.2d 763, 767 (1st Cir. 1992) (quotation omitted).  In this case, Petitioners claim the GAF Beddown EIS fails to adequately address:  livestock impacts, factual contradictions in the record, noise impacts, diminution in land values, cultural impacts, and other matters.  The Court will examine in turn each one of those claims.

### 1.      livestock

Petitioners claim the GAF Beddown EIS inadequately addresses the proposed beddown's impact on livestock, because the USAF's analysis rests upon studies that are more than 20 years old. See Petitioners' opening brief at 14.  Petitioners cite no record evidence suggesting, much less showing, that the studies relied upon by the USAF are outdated, unreliable, incomplete, or otherwise not the best scientific information available. See Colorado Environmental Coalition, 185 F.3d at 1172

(ruling that an agency's decision is neither arbitrary nor capricious when "the analysis constitutes a reasonable, good faith presentation of the best information available under the circumstances."). Instead, Petitioners merely refer to a few more recent, extra-record studies that apparently make the same observations and draw substantially the same conclusions as the studies relied upon by the USAF. They fail to explain, however, why their extra-record studies add any data that is "'essential' to reasoned decision making." Respondents' response brief (Doc. 128) at 11, *quoting* Colorado Environmental Coalition, 185 F.3d at 1172. In essence, Petitioners assume that "newer" means "better." Without any law or facts to support that assumption, this Court is in no position to set aside the GAF Beddown EIS on that basis. See Davison v. Department of Defense, 560 F.Supp. 1019, 1032 (S.D.Ohio 1982) (stating that an environmental impact statement "cannot reasonably be expected to include references to each and every relevant scientific study or opinion."); Conservation Council of North Carolina v. Froehlke, 435 F.Supp. 775, 793 (M.D.N.C. 1977) (stating that an agency is "not required to accumulate the sum total of scientific knowledge of the environmental elements affected by a proposal."). Critically, the studies relied upon by the USAF supports its conclusion regarding the effect low-level aircraft overflights have on livestock. See GAF Beddown EIS at 4-32 to 4-4-48, *citing* appendix J. Accordingly, the USAF's conclusion is neither arbitrary nor capricious. See Colorado Environmental Coalition, 185 F.3d at 1167.

Petitioners also claim the USAF was obligated to, but did not, conduct "a *contemporary* study using available techniques" to address public concerns regarding the potential impact of low-level overflights on livestock. Petitioners' opening brief at 15-16 (emphasis in original). Petitioners cite no legal authority requiring an agency to conduct a "contemporary study" before making an administrative decision. In fact, Tenth Circuit precedent only requires that federal agencies like the

USAF use "the best information available under the circumstances." Colorado Environmental Coalition, 185 F.3d at 1172 (emphasis added). The USAF was under no obligation to conduct a contemporary study. Its failure to do so does not invalidate the GAF Beddown EIS, notwithstanding the argument of counsel.

Petitioners ultimately claim that the GAF Beddown EIS's treatment of the livestock issue is fundamentally flawed, because the USAF based its "analysis on the number of sorties rather than the presumed number of flyovers . . . ." Petitioners' opening brief at 13. Petitioners mistakenly distinguish between "flyovers" and "sorties", when the GAF Beddown EIS makes clear that those terms are synonyms. See GAF Beddown EIS at 4-86 ("The following analysis assumes that as a first approximation, such impacts, as mediated by startle response, are related to changes in the frequency in overflight, expressed in 'sorties per day.'") (emphasis added). There is thus absolutely no factual basis for Petitioners' claim.

### 2. contradictions

### a) number of overflights

Petitioners claim the GAF Beddown EIS "contains contradictory, inconclusive, or misleading statements about the extent of exposure to noise events due to flyovers." Petitioners' opening brief at 16. In support of their claim, Petitioners once again mistakenly distinguish between "flyovers" and "sorties." See id. at 18 ("The flyovers have adverse impact regardless of whether the number of sorties decreases. If sorties decrease, but overflights increase, there may still be an incremental impact."). As noted above, "flyovers" and "sorties" are synonyms, so is there is no factual basis for Petitioners' argument.

Petitioners claim the GAF Beddown EIS is deficient because it is impossible to determine from that statement "whether overflights will increase and where." See Petitioners' opening brief at 18. The USAF candidly admits that "[b]ecause the various affected airspace units overlap in a complex manner, it is difficult to precisely quantify the changes in sortie numbers that would be experienced in any given area underlying the airspace." GAF Beddown EIS at 4-35. That admission alone discharges the USAF's duties under NEPA, because that statute only requires that agencies take a hard look at a proposed action's foreseeable consequences; it "does not mandate particular results." Colorado Environmental Coalition, 185 F.3d at 1172 (internal quotation omitted); see Sierra Club v. Sigler, 695 F.2d 957, 973 (5th Cir. 1983) ("Uncertainty as to environmental consequences need not bar action as long as the uncertainty is forthrightly considered in the decisionmaking process and disclosed in the EIS."); Izaak Walton League of America v. Marsh, 655 F.2d 346, 377 (D.C.Cir. 1981) ("So long as the environmental impact statement identifies areas of uncertainty, the agency has fulfilled its mission under NEPA."). However, the USAF goes on to explain that its inability to quantify the exact number of sorties in a specific area is inconsequential, because the noise metrics employed in the GAF Beddown EIS "provide a better index of overflight than can be obtained by simple estimates of overflight frequency." GAF Beddown EIS at 4-35. The USAF was entitled to rely upon its experts in making that determination.

**b)    overflight avoidance**

Petitioners claim the GAF Beddown EIS's discussion on overflight avoidance is deficient, because the USAF has historically failed to implement overflight mitigation measures despite promises to do the same. See Petitioners' opening brief at 18. In support of their claim, Petitioners point out that several individuals expressed concerns about the USAF's past failures to mitigate

overflight impacts, but the USAF gave "no response to these public comments, suggesting the verbiage in the EIS about avoiding overflights in specific locations is simply surplusage and not a true mitigating measure." Id. at 18-19, *citing* Administrative Record, volume 1, book 6, § 1.0 at 59-61; id., § 1.0 at 78; id., § 3.0 at 55; and id., § 4.0 at 50.

Petitioners' claim is critically flawed in that the administrative record shows why none of the cited comments warranted a formal response. The first comment (§ 1.0 at 59-61) questioned HAFB's commitment to give advance warning of aircraft overflight in the Alpine, Texas area in light of the fact that it had failed to do so in the past. In response, Dan King, chief of airspace and ranges at HAFB, stated that HAFB had not reneged on any commitment to give advance warning in the Alpine, Texas area, because "Holloman is not flying in this area yet. We have not." Id. at 60, ll. 20-21. The second comment (§ 1.0 at 78) questioned whether the USAF and the GAF would go as far as "105 degrees west latitude or will you go north as far as 31 degrees north longitude in this German operation?" In response, Mr. King stated that the proposed operation would not affect the individual's property, because it will be "well east of the 105 line and it goes down south of the 30 degree line." Id. at 79, l. 25 to 80, ll. 1-3. The third comment (§ 3.0 at 55) questioned whether the proposed operation would involve low-level supersonic exercises. In a formal response, the USAF stated that "[t]he proposed action does not involve low-level supersonic operations." Id., § 7.0 at 11. And the fourth comment (§ 4.0 at 50) questioned HAFB's commitment to give advance warning in light of the fact that it had failed to do so in the past. That comment was made by an individual who had dealt with Canon Air Force Base, not with HAFB. See id. at 53, ll. 10-13 ("We tried to work with this and do the dog and pony show, go over to Canon and all their presentations, conflicts."). The administrative record thus shows why none of comments cited by Petitioners

warranted a formal response and, as a consequence, why it is unreasonable to infer that the GAF

Beddown EIS is deficient merely because the USAF failed to formally address three of those

comments.

The foregoing point notwithstanding, the administrative record shows not only that the USAF

and HAFB[6] promised to mitigate overflight impacts, but that they are obligated to do the same. For

example, the Record of Decision states in relevant part that:

> Typical low-level overflights will be short in duration, and in accordance with
> applicable regulations. . . . The Air Force maintains a process to identify and avoid
> noise-sensitive areas as identified by affected individuals. Areas identified under this
> process are avoided by greater distances than the prescribed minimum avoidance
> criteria to minimize noise levels.

Administrative Record, volume 1, book 7 at 2091. The USAF and the GAF are legally bound by the

Record of Decision, so if their pilots fail to abide by the listed mitigation measures they are subject

to all recourse contemplated by federal law and USAF regulations. See 40 C.F.R. § 1505.3

("Mitigation and other conditions established in the environmental impact statement or during its

review and committed as part of the decision shall be implemented by the lead agency or other

appropriate consulting agency.") (emphasis added); Agreement at 2-3 (stating that the GAF, like the

USAF, must conduct its operations "in accordance with applicable US law and regulations, including

USAF, ACC, and 49FW regulations, directives, and procedures."). In order to further effectuate the

overflight mitigation measures set forth in the GAF Beddown EIS and the Record of Decision, the

USAF informed the general public how to curtail extremely low overflights, how to report pilot non-

---

[6] HAFB is the entity functionally responsible for effectuating mitigation measures associated with the proposed beddown. See Administrative Record, volume 1, book 6, § 1.0 at 60, ll. 2-6 (in response to public comment regarding advance notice of flight operations, Mr. King, chief of airspace, and ranges at HAFB, stated: "We're required to note when those flights are filed and there is public information available through the FAA through the flight service station.").

compliance with the USAF's operating procedures for military training airspace, and how to file claims against the USAF for damages resulting from aircraft overflight.  See *infra* at 13.  There is therefore again no factual basis for Petitioners' claim.

### c)  cost of NTC

Petitioners claim there is "a contradiction inherent in the issue of cost responsibility between the USAF and [the] GAF."  Petitioners' opening brief at 20.  According to Petitioners, the GAF is obligated under the Agreement to pay for all of the range costs associated with the New Target Complex ("NTC") and yet Colonel Don Hargarten of the USAF stated at a public hearing that the GAF would pay for only 60 percent of the range costs, with the USAF covering the difference.  See id., *citing* the Agreement and Administrative Record, volume 1, book 6, § 6.0 at 49 (statement by Colonel Hargarten).

Petitioners take the Agreement and Colonel Hargarten's statement out of context.  The Agreement does state that the FMOD will pay all costs associated with the GAF's operations, including range costs.  See Agreement at 6, ¶ 4.  However, it goes on to state that "[c]osts to operate and maintain facilities and provide services that are used jointly will be shared by the Parties in proportion to their usage . . . ."  Id.  Colonel Hargarten thus explained that the FMOD would not bear all of the range costs in this case, because "U.S. aircraft will also use those ranges.  In fact if the Germans left in ten years, the ranges would still be here, so we are paying 40 percent of the range costs."  Administrative Record, volume 1, book 6, § 6.0 at 49, ll. 17-20.  In other words, the FMOD is obligated to pay all costs associated with the GAF's operations, including its proportionate share of the range costs, but it is not obligated to pay all costs associated with the USAF's operations.  There is no inherent contradiction regarding the issue of cost responsibility for range costs.

**d)** **overflight floor**

Petitioners claim there is a "potential" contradiction in the USAF's statements regarding the overflight floor (i.e., the feet above ground level) that pilots must observe along the MTRs. <u>See</u> Petitioners' opening brief at 21. In support of their claim, Petitioners point out that on average 90 percent of the anticipated overflights will take place below 500 feet. <u>See</u> <u>id.</u>, *citing* GAF Beddown EIS at 2-13. They also point out that overflight of people is subject to a 500-foot floor and so, "[u]nless 90 percent of the MTR is over <u>uninhabited land</u>, the 500 foot floor cannot be met." <u>Id.</u> (emphasis added).

The Court notes as a preliminary matter that Petitioners' emphasis on "uninhabited land" is misplaced. Federal Aviation Regulation § 91.119 assigns overflight floors based not upon whether the affected land is "uninhabited" but upon whether the affected area is "congested," "other than congested," or "sparsely populated." 14 C.F.R. § 91.119. In areas that are "sparsely populated," Section 91.119(c) only requires that an aircraft be operated no "closer than 500 feet to any person, vessel, vehicle, or structure." In other words, there are instances when an aircraft may operate below 500 feet even though the affected area is sparsely populated.

In light of that note, the Court rejects Petitioners' claim that there is a potential contradiction in the USAF's statements regarding the overflight floor that pilots must observe along the MTRs. Given the nature of the arid ranch land involved, it may well be that 90 percent of the MTRs exist over sparsely populated land. If so, by Petitioners' own admission, the USAF can meet the 500-foot floor. <u>See</u> Petitioners' opening brief at 21; <u>see also</u> <u>Custer County Action Ass'n</u>, 256 F.3d at 1033 ("Most MOAs and MTRs are located in sparsely populated areas, thus allowing a military pilot to fly below an altitude of 500 feet in a remote MTR or MOA and still be within navigable airspace, under

the conditions permitted by the regulation."). The Court cannot say otherwise, because Petitioners have not furnished any facts supporting a different conclusion.

Petitioners also claim that "[a]necdotal evidence adduced at the public hearings demonstrates how often overflights take place below the FAA's mandatory 500 feet [sic] minimum" and that "[n]o attempt was made to address (or redress) the anecdotal evidence of low flights." Petitioners' opening brief at 21-22. As noted above, there are instances when military pilots may fly below an altitude of 500 feet, so Petitioners' allusion to a "mandatory" 500-foot floor is misplaced. That point notwithstanding, and contrary to Petitioners' claim, the administrative record shows that the USAF responded to public concerns regarding extremely low overflights, informing the public how to curtail extremely low overflights,[7] how to report pilot non-compliance with the USAF's operating procedures identified for military training airspace,[8] and how to file claims against the USAF for damages resulting from aircraft overflight.[9] It is inconsequential that the USAF did not individually address every comment made at the public hearings, because the administrative record as a whole fully reflects the concerns voiced by the general public. See Duck River Preservation Ass'n v. Tennessee Valley Authority, 410 F.Supp. 758, 763 (E.D.Tenn. 1974) (stating that although not all

_____

[7] GAF Beddown EIS at 4-35 (informing public how to curtail extremely low overflights over particular areas: "When identified by private owners or operators, airspace managers can include appropriate avoidance procedures for specific locations."); id. at 4-38 (recognizing in category devoted to private land-impact evaluation that "[i]nadvertent overflights of rural residents could occur," but that avoidance measures could be taken)

[8] Administrative Record, volume 1, book 6, § 7.0 at 15 (informing public how to report pilot non-compliance with USAF procedures, in response to TC-35 (id., § 3.0 at 90-91), who commented: "I was fixing a roof on some old cabins when two plan[e]s went by. I could see the guys['] blue eyes. If I had my rifle, I might have shot one of them down. They were that close to us.").

[9] Administrative Record, volume 1, book 6, § 7.0 at 3 (informing general public how to file claims against the USAF for damages, in response to AP-5 (id., § 1.0 at 63), who commented: "I want to know how accountable the Air Force Base is for the damages caused by all these low-level flights?").

comments from the general public were included in appendix to impact statement, where the synoptic language included in the appendix brought to the attention of agency officials the full circle of the criticisms, the agency's response was adequate).

###    3.    noise levels

Petitioners claim the USAF failed to take a hard look at the noise issue for an indiscriminate number of reasons, the most critical allegations being that the GAF Beddown EIS: used flawed noise methodologies, was based upon incorrect assumptions, failed to consider the greater annoyance of aircraft noise compared to street noise, relied upon irrelevant and outdated data, and underestimated the average noise levels within the MOAs and MTRs.  See Petitioners' opening brief at 22-27.  In support of their claim, Petitioners rely primarily upon the declarations of Dr. William J. Weida and Dr. Karl D. Kryter.  See id., exhibit 11 (Dr. Weida's declaration) and exhibit 12 (Dr. Kryter's declaration).

The Court rejects Petitioners' claim on three grounds.  First, Petitioners cannot sustain their claim with the declarations of Dr. Weida and Dr. Kryter.  This Court has entered an order striking their declarations on the ground that they are not part of the administrative record and, as a consequence, they are beyond the purview of this Olenhouse appeal.  See Memorandum Opinion and Order Granting Motion to Strike Extra-Record Declarations (Doc. 163) at 6-9.  This Court will not set aside the GAF Beddown EIS based on Petitioners' extra-record declarations, which are a belated attempt to undermine the expert opinions upon which the USAF relied.

Second, the administrative record establishes that the USAF performed a detailed analysis of the proposed beddown's potential noise impact using accepted noise metrics, methodologies, and assumptions.  The USAF used the "Sound Exposure Level" ("$L_{AE}$") metric to represent the intensity

of a sound and its duration, the "Day-Night Average Sound Level" ("$L_{dn}$") metric as a cumulative sound metric to account for the sound level, duration, and frequency of noise producing events, and the "Onset-Rate Adjusted Day-Night Average Sound Level" ("$L_{dnr}$") metric to account for the surprise effect caused by the sudden onset of aircraft noise events on humans. See GAF Beddown EIS at appendix D, D-4 - D-11. The USAF explained in the GAF Beddown EIS that the $L_{AE}$, the $L_{dn}$, and the $L_{dnr}$ metrics accurately describe the proposed beddown's potential impact on the noise environment, explaining in particular that such metrics may be used in both urban and rural settings. See id.; see also id. at 4-10 ("While originally developed for major noise sources such as highways and airports in populated areas, $L_{dn}$ [and by extension, $L_{dnr}$] has been shown to be applicable to infrequent events and to rural populations exposed to sporadic military aircraft noise.") (internal citations omitted). The Tenth Circuit recently opined that use of those very metrics to evaluate noise impacts occasioned by aircraft overflight in rural settings is "well-established and widely accepted." Custer County Action Ass'n, 256 F.3d at 1035; see Morongo Band of Mission Indians v. F.A.A., 161 F.3d 569, 579 (9th Cir. 1998) (dismissing plaintiff's NEPA challenge on the ground that it cited "no authority that would require us to conclude that the FAA's decision to rely on average noise levels, rather than single-event noise levels was arbitrary or capricious.").

And finally, the conclusions reached in the GAF Beddown EIS are based on models developed and data gathered, scrutinized, and then analyzed by recognized experts in the field of noise metrics. The fact that different models, contradictory evidence, other data, and conflicting opinions may exist on the noise issue does not invalidate the GAF Beddown EIS, because the USAF was entitled to rely on its "own experts so long as their decisions are not arbitrary and capricious." Custer County Action Ass'n, 256 F.3d at 1036. Petitioners have failed to establish that the decisions made by the USAF's

experts are arbitrary or capricious; instead, they have done nothing more than proffer the conflicting extra-record opinions of their own experts. Such opinions do not provide a basis upon which this Court may overturn the USAF's final decision. See id., *citing* Arapahoe County Pub. Airport Auth., 242 F.3d at 1218.

### 4. land values

Petitioners contend that the USAF failed to evaluate the proposed beddown's potential impact on land values. See Petitioners' opening brief at 27. Instead of addressing that impact, Petitioners claim the GAF Beddown EIS "dismissively states it cannot quantify the land value because such a quantification would be too speculative." Id. at 27-28. In support of their contention, Petitioners rely primarily upon the declaration of Armand Smith. See id., exhibit 13 (Mr. Smith's declaration).

The Court rejects Petitioners' claim on three grounds. First, Petitioners cannot sustain their claim with Mr. Smith's declaration. This Court has entered an order striking his declaration based on the fact that it is not part of the administrative record and, as a consequence, it is beyond the purview of this Olenhouse appeal. See Memorandum Opinion and Order Granting Motion to Strike Extra-Record Declarations (Doc. 163) at 4-9. Therefore, this Court will not set aside the GAF Beddown EIS based on Mr. Smith's extra-record declaration.

Second, the administrative record establishes that the USAF fully considered Petitioners' concerns and anecdotal evidence regarding the diminution in land values caused by aircraft overflight. See GAF Beddown EIS at 4-126; Administrative Record, volume 1, book 6, § 7.0 at 5 (responding to AP-21 (Administrative Record, volume 1, book 6, § 1.0 at 88-89), who expressed concern that aircraft overflight would affect property values). The record also establishes that the USAF attempted to quantify the potential diminution in land value, but that its attempt proved unsuccessful

because of the rural nature of the area, existing variability in land values, and the relatively sporadic nature of the proposed overflights.  See GAF Beddown EIS at 4-126.  Contrary to Petitioners' claim, the USAF did not dismiss the valuation issue; rather, it opined that it was impossible to quantify the diminution in land values.  The fact that Mr. Smith thinks that the "diminution" can be quantified does not invalidate the GAF Beddown EIS, because the USAF was entitled to rely upon the opinions of its experts.  See Custer County Action Ass'n, 256 F.3d at 1036.

And finally, the USAF's inability to place a dollar amount on the proposed beddown's impact on extant property values is not tantamount to dismissively ignoring the valuation issue.  The USAF did all that it was required to do by disclosing and then forthrightly discussing its inability to quantify the diminution in land values, a diminution the USAF deemed both unlikely and remote.  See Environmental Defense Fund, Inc. v. Andrus, 619 F.2d 1368, 1375 (10th Cir. 1980) (stating that if environmental effects "cannot be readily ascertained . . . detailed discussion of environmental effects is not contemplated under NEPA."); Sierra Club v. Sigler, 695 F.2d at 973 ("Uncertainty as to environmental consequences need not bar action as long as the uncertainty is forthrightly considered in the decisionmaking process and disclosed in the EIS."); Izaak Walton League of America, 655 F.2d at 377 ("Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary.  So long as the environmental impact statement identifies areas of uncertainty, the agency has fulfilled its mission under NEPA."); Town of Norfolk v. U.S. E.P.A., 761 F.Supp. 867, 887-888 (D.Mass. 1991) (holding that environmental impact statement's failure to put dollar amount on probable decrease in property values as a result of agency action was not unreasonable and did not result in failure to discuss adequately socioeconomic impacts of proposed action).  Petitioners have not shown that the USAF failed to take a hard look at the valuation issue in its GAF Beddown

EIS; instead, they have done nothing more than proffer the conflicting extra-record opinion of their own expert. For the reasons stated, Mr. Smith's extra-record opinion does not provide a basis upon which this Court may overturn the USAF's final decision.

5.    **cultural impact**

Petitioners claim the GAF Beddown EIS incorrectly suggests that the Mescalero Apache expressed "no cultural concerns with regard to the West Otero Mesa site . . . ." Petitioners' opening brief at 30. However, the USAF accurately noted in the GAF Beddown EIS that the Mescalero Apache expressed concerns about the proposed beddown's potential impact on traditional cultural properties on the West Otero Mesa, but that those properties were not specifically identified as being within the West Otero Mesa NTC, itself. See GAF Beddown EIS at 3-104. The USAF's distinction between the West Otero Mesa as a whole and the West Otero Mesa NTC as a subsection of that whole is reasonable, given that the USAF was unable to identify any traditional cultural properties within the NTC area despite "an intensive, systematic cultural resources inventory of the entire West Otero Mesa NTC area." Id. Notwithstanding its findings, and in an effort to allay the Mescalero Apache's concerns, the USAF initiated government-to-government communication with the Mescalero Apache regarding the proposed placement of the NTC. The USAF thus did all that it was required to do, and more.

Petitioners also claim the USAF failed to complete a cultural properties inventory of the West Otero Mesa tactical training site. See Petitioners' opening brief at 5. That claim is belied by the administrative record, which shows that the USAF completed a final cultural resources report and then transmitted a copy of that report to the Mescalero Apache. See Administrative Record, volume 1, book 7, page 2040; GAF Beddown EIS, appendix F, letter dated August 29, 1997, from Lisa M.

Meyer to Cheryl Parker. The Court will not set aside the USAF's decision based on its treatment of the cultural resources issue.

### 6. other alleged deficiencies

#### a) airplane accidents

Petitioners claim the GAF Beddown EIS fails to adequately address the impact that an airplane accident might have on the affected area. <u>See</u> Petitioners' opening brief at 31. To the contrary, the USAF estimated the probability that an airplane accident would occur over the affected area, categorized the physical consequences associated with airplane accidents (for example, categorizing as a Class A mishap an accident resulting in loss of life or permanent disability), categorized the financial harm associated with airplane accidents (for example, categorizing as a Class A mishap an accident resulting in a total cost of more than one million dollars), and identified the environmental harms that may result from an airplane accident. <u>See</u> GAF Beddown EIS at 3-159 to 3-162 and 3-166 to 3-167. The USAF's discussion regarding the impact of airplane accidents on the affected area provided the ultimate decisionmaker with the facts necessary to make a fully informed decision. NEPA requires nothing more.

#### b) aerial refueling

Petitioners claim the GAF Beddown EIS fails to address the impact that expanded aerial refueling may have on the environment. <u>See</u> Petitioners' opening brief at 31. While their statement may be factually true, Petitioners have not cited any record evidence showing that the issue was raised during the extensive administrative proceedings nor have they cited any legal authority obligating the USAF to address that issue. In the absence of legal authority in point, the Court reiterates that the intent and purpose of NEPA is to ensure that the decisionmaker has considered all of the factors

needed to make a truly informed decision. Petitioners fail to suggest, much less explain, why the absence of a discussion on aerial refueling deprived the USAF of all the information necessary to make a truly informed decision. This Court will not speculate on their behalf. See Davison, 560 F.Supp. at 1025 ("NEPA does not require perfection, and an EIS will not be rejected simply because it fails to address all possible contingencies or omits the views of a particular expert.").

     **c)**     **open issues**

Petitioners claim the USAF implemented the proposed beddown before the Fish and Wildlife Service ("FWS") completed its formal biological opinion, in violation of the Endangered Species Act ("ESA"). See Petitioners' opening brief at 32. That claim is belied by the administrative record, which makes clear that the USAF made a commitment to refrain from implementing the proposed beddown until after the FWS completed its biological opinion. See GAF Beddown EIS at 2-60 to 2-69 ("If selected, the proposed action would not be implemented until Endangered Species Act issues have been resolved with the [FWS].") (emphasis added). In fact, the administrative record shows that the FWS issued its biological opinion before the USAF executed its Record of Decision. Compare Administrative Record, volume 1, book 7 at 1992 (showing that the FWS executed its biological opinion on May 8, 1998) with id. at 2093 (showing that the USAF executed its Record of Decision on May 29, 1998). The USAF did not take final action before the FWS discharged its duties under the ESA.

Petitioners next claim that the GAF Beddown EIS "makes no attempt to address mitigating measures appropriate to address ESA concerns." Petitioners' opening brief at 33. However, they overlook the fact that the USAF specifically noted in the GAF Beddown EIS that its biological analysis was based on extensive discussions between the USAF and the FWS during the ESA-

mandated consultation process and, more importantly, that "[f]light restrictions . . . will meet the requirements that are identified by the Air Force and the USFWS as reflected in the consultation under the Endangered Species Act." GAF Beddown EIS at 4-89 (emphasis added). One month after the USAF issued the GAF Beddown EIS, the FWS issued its biological opinion in which mitigation measures in the form of flight restrictions were addressed. See Administrative Record, volume 1, book 7 at 1992. The USAF's Record of Decision addresses those mitigation measures in acute detail. See id. at 2091-92. In fact, the Record of Decision compels the USAF to abide by all of the mitigation measures set forth in the FWS's biological opinion, which is consistent with USAF's commitment to do the same in the GAF Beddown EIS. See id.; 40 C.F.R. § 1505.3 (agency is bound by record of decision). The decisionmaker was fully informed of the biological consequences and mitigation measures associated with the proposed beddown before executing its Record of Decision.

Petitioners finally claim that the GAF Beddown EIS fails to evaluate additional proposed actions occurring in the same region of influence as the proposed beddown. See Petitioners' opening brief at 32. In fact, the USAF did evaluate the impact the additional proposed actions might have on the environment. See generally GAF Beddown EIS at 5-7 through 5-35. The USAF undertook its analysis even though the additional proposed actions were merely in the planning stage. See id. at 2-53 There is thus no factual basis for Petitioners' claim.

**d)      accountability**

Petitioners claim the USAF failed to "address the issue of pilot/USAF/GAF accountability for overflights below the 500 foot floor . . . ." Petitioners' opening brief at 33. As noted above, the administrative record shows that the USAF did in fact respond to public concerns regarding extremely low overflights and informed interested persons how to report pilot non-compliance with the USAF's

operating procedures identified for military training airspace, how to file claims against the USAF for damages resulting from aircraft overflight, and how to curtail aircraft overflights. <u>See</u> *supra* at 13. The administrative record also shows that the GAF and its pilots were subject to the same rules, regulations, and operating procedures as their USAF counterparts. <u>See</u> Agreement at 2-3 (stating that the GAF must conduct its operations "in accordance with applicable US law and regulations, including USAF, ACC, and 49FW regulations, directives, and procedures."). The USAF fully addressed the issue of accountability.

      **e)     civil aviation impact**

Petitioners claim the USAF failed to address "concerns about the impact of the MTR flights upon civil aviation." Petitioners' opening brief at 34. In fact, the USAF stated in the GAF Beddown EIS that the proposed beddown would have a negligible impact on civil aircraft. <u>See</u> 4-1 to 4-5 (discussing impact of proposed action to civil aircraft within HAFB's airspace, the MTRs, the MOAs, and the Restricted Areas). By addressing the civil aviation issue, the USAF discharged its duties under NEPA. <u>See</u> <u>Izaak Walton League of America</u>, 655 F.2d at 377 ("Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary.").

**D.    Failure to Consider Alternatives**

Federal agencies like the USAF must evaluate all reasonable alternatives to the proposed action, including a "no action" alternative. <u>See</u> 42 U.S.C. § 4332(2); 40 C.F.R. §§ 1502.1 and 1502.14. However, agencies do not have to "analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or . . . impractical or ineffective." <u>Colorado Environmental Coalition</u>, 185 F.3d at 1174 (internal quotation omitted). In this case, Petitioners claim the USAF failed to adequately address: alternative sites to HAFB, existing ranges, the "no

22

action" alternative, the East Otero Mesa site, and the Tularosa Basin site. The Court will examine in turn each one of those claims.

### 1.    HAFB

Petitioners claim the USAF failed to consider any alternative beddown sites to HAFB, "including the beddown of the aircraft at George Air Force Base, where the GAF operated 'for many years' before it relocated to HAFB." Petitioners' opening brief at 35-36. While it is true that the USAF limited its analysis to HAFB, that fact alone does not invalidate the GAF Beddown EIS. In order to comply with NEPA, the USAF had to take a hard look at the environmental consequences associated with reasonable alternatives to its proposed action; it did not have to analyze impractical or ineffective alternatives. See Colorado Environmental Coalition, 185 F.3d at 1174 (quotations omitted); Airport Neighbors Alliance, Inc. v. U.S., 90 F.3d 426, 432 (10th Cir. 1996) ("[A]n agency decision concerning which alternatives to consider is necessarily bound by a 'rule of reason and practicality.'"). In this case, the USAF specifically stated that HAFB was "the only feasible location for the Tornado beddown" because of the "need to optimize use of previous infrastructure investments." GAF Beddown EIS at 1-5 to 1-6; see Administrative Record, volume 1, book 6, § 7.0 at 3 ("Other bases are outside the scope of this agreement [between the USAF and the FMOD] and therefore are not reasonable alternatives."). There is no record evidence assailing the USAF's conclusion, so the Court will not overturn the Record of Decision on that basis.

In regard to Petitioners' specific suggestion that the USAF should have considered George Air Force Base as an alternative site for the proposed beddown, the GAF Beddown EIS makes clear why that suggestion is not well-taken:

During the early 1990s, a number of U.S. bases were closed . . . . <u>One of the bases</u> <u>selected for closure was George AFB.</u>  During the closure process, the F-4 training program for German aircrews was transferred to Holloman AFB.

1-3 (emphasis added).  The GAF Beddown EIS thus establishes that George Air Force Base was not a reasonable alternative site to HAFB, as it was selected for closure during the base-closing process.

## 2.    existing ranges

Petitioners claim the USAF failed to adequately consider use of existing ranges as an alternative to constructing a new target complex.  <u>See</u> Petitioners' opening brief at 37.  Specifically, in regard to the USAF's rejection of the Melrose Range site, Petitioners claim the USAF summarily concluded that the "'range was unacceptable because 'certain types of training could not be effectively accomplished.'"  Petitioners' opening brief at 37, *quoting* GAF Beddown EIS at 2-15. According to Petitioners, the GAF Beddown EIS "provides no details as to what types of training cannot be satisfied."  <u>Id.</u>

Petitioners' claim is belied by the administrative record, which shows that the USAF, after thoroughly describing its site selection criteria, considered whether the extant ranges could serve as a site for the proposed beddown.  <u>See</u> GAF Beddown EIS at 2-14 through 2-28.  The Melrose Range site was the only existing range that the USAF deemed to be a candidate.  Upon further consideration, the USAF eliminated the Melrose Range site from detailed study.  Contrary to Petitioners' claim, the USAF adequately explained why the Melrose Range was not a reasonable alternative to the NTC:

Melrose Range is 160 [nautical miles] from Holloman AFB; this distance limits the amount of fuel a student has for range training.  Flying to a range near the maximum training radius limits the student crew to one or two [terrain following radar] patterns and no other training deliveries.  Since a normal syllabus sortie includes up to eight

> delivery events, students operating on Melrose Range would receive 25 percent or less of the desired level of range training experience.

GAF Beddown EIS at 2-49. The USAF thus eliminated the Melrose Range site from detailed consideration because the GAF pilots would be unable to perform a normal syllabus sortie. The Melrose Range's deficiencies provided the USAF with a reasonable basis to eliminate it from further consideration. See Custer County Action Ass'n, 256 F.3d at 1041 ("Alternatives that do not accomplish the purpose of an action are not reasonable."); Colorado Envtl. Coalition, 185 F.3d at 1174-76. That is true even if selection of the Melrose Range site or one of the other existing ranges would have significantly mitigated environmental impacts. See Utah Shared Access Alliance v. U.S. Forest Service, 288 F.3d 1205, 1207 (10th Cir. 2002) ("NEPA does not require agencies to elevate environmental concerns over other appropriate considerations . . .[;] it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action .") (internal quotation omitted).

### 3. no action

Petitioners claim the GAF Beddown EIS fails to adequately consider the "no action" alternative, because the USAF inappropriately committed resources to the proposed beddown before making a final decision. See Petitioners' opening brief at 38. That claim is belied by the Amended Agreement, which states that implementation of the proposed beddown was "subject to a final decision following completion of the National Environmental Policy Act (NEPA) process." Amended Agreement at 2. By conditioning the proposed beddown on completion of the NEPA process, the USAF did not inappropriately commit any resources to the proposed beddown before the Record of Decision was entered. The administrative record in fact shows that the USAF analyzed the no action

alternative with the same degree of specificity as the proposed beddown.  See GAF Beddown EIS at 2-61 through 2-68.  There is no factual basis for Petitioners' contention.

### 4. East Otero Mesa

Petitioners claim the USAF failed to adequately consider the East Otero Mesa site as an alternative site to HAFB, because the reasons given in the GAF Beddown EIS for rejecting the East Otero Mesa site--conflicts with joint use activities, adverse impact on a large number of grazing units, and adverse effect on water lines--also exist with regard to the West Otero Mesa site.  See Petitioners' opening brief at 39.  Petitioners limit their discussion to the factors of grazing units and water lines, thereby understating why the East Otero Mesa site was rejected in favor of the West Otero Mesa site.  Specifically, Petitioners ignore the USAF's concern that the East Otero Mesa site "presented several conflicts with joint-use activities [between the USAF and the Army] in that portion of McGregor Range" whereas the West Otero Mesa site "would allow concurrent operations with most Army operations on their Tularosa Basin impact areas, thus minimizing scheduling problems or interruption in either Air Force or Army training."  Compare GAF Beddown EIS at 2-28 (East Otero Mesa) with id. at 2-47 (West Otero Mesa).  The USAF's decision to reject the East Otero Mesa was therefore reasonable.

### 5. Tularosa Basin

Petitioners claim the USAF's failure to select the Tularosa Basin site as the preferred site "shows a flawed alternatives analysis and [a] failure to consider mitigating measures[,]" because selection of that site would have had a beneficial impact on the environment.  See Petitioners' opening brief at 40.  While the Tularosa Basin site may have had a beneficial environmental impact, it did not meet as many criteria as the West Otero Mesa site in terms of meeting the proposed beddown's

operational objectives.  See GAF Beddown EIS at 2-47 to 2-48.  Accordingly, the USAF's selection

of the West Otero Mesa site over the Tularosa Basin site was neither arbitrary nor capricious, even

though the Tularosa Basin site may have been more environmentally friendly.  See Custer County

Action Ass'n, 256 F.3d at 1041 ("Alternatives that do not accomplish the purpose of an action are

not reasonable."); Utah Shared Access Alliance, 288 F.3d at 1207.

Petitioners also claim that the USAF gave short shrift to the Tularosa Basin site given the fact

that several individuals, including a representative from the Bureau of Land Management ("BLM"),

considered the Tularosa Basin site worthy of more consideration than it received.  See Petitioners'

opening brief at 43.  The BLM and several other agencies did in fact speak in favor of the Tularosa

Basin site.  However, that fact alone does not entitle Petitioners to any form of relief, because NEPA

"requires agencies preparing environmental impact statements to consider and respond to the

comments of other agencies, not to agree with them."  Custer County Action Ass'n at 1038, *citing*

40 C.F.R. § 1503.4.  The administrative record shows that the USAF considered and responded to

the BLM's comments.  See Administrative Record, volume 1 at 2062-2065.  In fact, it shows that

the USAF eventually resolved all of the BLM's concerns over the NTC's location.  See id.

Petitioners finally claim that the USAF failed to "consider measures that could mitigate

environmental concerns in the selected option."  Petitioners' opening brief at 46.  According to

Petitioners, the GAF Beddown EIS contains "no discussion" of mitigating measures in relation to the

"number of overflights, the impact to land and property values, and the impact of these flyovers on

quality of life for both the humans and animals in the area."  Id.  In fact, the administrative record

shows that the USAF addressed and is bound by mitigation measures regarding the impact categories

of:  noise quality; biological resources; archaeological, cultural, and historic resources; and soil and

water resources.  See Administrative Record, volume 1, book 7 at 2090-93.  There is no factual basis for Petitioners' claim.

## E.     Cumulative Effects

Federal agencies like the USAF must include within their environmental impact statements a full examination of other actions that may have a "cumulative or synergistic environmental effect . . . ."  City of Tenakee Springs v. Clough, 915 F.2d 1308, 1312 (9th Cir. 1990).  An environmental impact statement must consider the "past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  Colorado Environmental Coalition, 185 F.3d at 1176, quoting 40 C.F.R. § 1508.7.  "Determination of the extent and effect of [cumulative impacts on range of resources], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."  Custer County Action Ass'n at 1037 (internal quotation omitted).

### 1.     cumulative effects

Petitioners claim the USAF failed to adequately address cumulative effects, because the GAF Beddown EIS ignores additional actions that have been proposed since the draft environmental impact statement was issued, including the increase in airspace use based on the expansion of the McGregor Range, the Realistic Bomber Training Initiative ("RBTI"), the proposed Fort Bliss Mission and Master Plan, and additional McGregor Land withdrawals.  See Petitioners' opening brief at 47-48.  To the contrary, the GAF Beddown EIS's "cumulative effects" section includes a category exclusively devoted to "Reasonably Foreseeable Actions that Interact with the Proposed Beddown." Id. at 5-3.  Within that category, the USAF specifically addresses the McGregor Range, the RBTI, and the proposed Fort Bliss plan.  See id. at 5-4.  Throughout its cumulative effects analysis, the

USAF discusses in each impact category the cumulative effects associated with "Reasonably Foreseeable Actions that Interact with the Proposed Beddown", specifically mentioning the McGregor Range, the RBTI, and the proposed Fort Bliss plan when applicable. See e.g., GAF Beddown EIS at 5-13 to 5-15 (noise), 5-17 to 5-18 (land use), 5-20 to 5-21 (air quality), and 5-23 to 5-24 (biological resources). The administrative record thus shows that the USAF adequately discussed the cumulative effects associated with reasonably foreseeable actions.

### 2. original beddown

Petitioners claim the environmental assessment for the original beddown, the ALCM/Talon MOA EA, and the GAF Beddown EIS should have been integrated into a single environmental impact statement because they are inextricably interconnected with one another. See Petitioners' opening brief at 48. In support of their claim, Petitioners allege that in May 1994, at the time of the original beddown, the USAF and the GAF had already agreed to beddown 30 more GAF Tornados at HAFB and, as a consequence, all 42 GAF Tornados should have been analyzed in the same document. See id.

The Court rejects that claim for two reasons. First, the administrative record shows that the USAF and the GAF did not formally agree to the proposed beddown until May 1998, approximately four years after they agreed to the original beddown. Compare Amended Agreement at 3 with Agreement at 11. And second, the administrative record also shows that as late as June 1997, more than four years after the original beddown's environmental assessment was completed and more than three years after the Agreement was executed, the proposed beddown still had not progressed beyond the planning phase and its potential environmental impact could not be fully ascertained. See ALCM/Talon MOA EA at 2-10 to 2-11 ("The U.S. Air Force and GAF are considering a proposal

to beddown an additional 30 PA-200 aircraft at Holloman AFB in the 1999 time frame. This proposal is still in the planning phase and has not been completely developed to fully ascertain its potential effects . . . ."). Based on those facts, the USAF cannot be faulted for not consolidating the original beddown's environmental assessment and the GAF Beddown EIS, nor can the USAF be faulted for not consolidating the ALCM/Talon MOA EA with the GAF Beddown EIS. As noted above, when the ALCM/Talon MOA EA was completed, the proposed beddown was still in the planning phase and its potential environmental impact was still not fully known. See id. Ultimately, the ALCM/Talon MOA EA accounted for the proposed beddown's impact on the environment,[10] and the GAF Beddown EIS fully noted the proposed airspace modifications.[11] NEPA requires nothing more. See Colorado Environmental Coalition, 185 F.3d at 1176.

### 3. McGregor Range Land withdrawal renewal

Petitioners claim the USAF failed to adequately assess the environmental impact caused by the potential withdrawal renewal of the McGregor Range. See Petitioners' opening brief at 50. That claim raises issues and arguments that have already been addressed by the Court. See *supra* at 28. That being the case, the Court will not repeat its analysis here. For the reasons stated, the USAF adequately addressed in the GAF Beddown EIS the environmental impact associated with the McGregor Range land withdrawal renewal.

---

[10] ALCM/Talon MOA EA at 2-10 ("In order to provide an indication of potential cumulative impacts that might result from the additional aircraft [under the proposed beddown], however, preliminary estimates were made of the number of additional sorties that might be flown in IR-102/141 and in the Talon MOAs.").

[11] GAF Beddown EIS at ES-3 ("If implemented, these airspace modifications [proposed by the ALCM/Talon MOA EA] would also be used by the additional 30 Tornados; if these airspace modifications are not implemented, existing airspace would be used. . . . These differences in airspace availability and use are taken into account in the analysis of impacts associated with the beddown of the Tornado aircraft at Holloman AFB.").

### 4.     Mexican Spotted Owl

Petitioners claim the GAF Beddown EIS failed to consider the Fish and Wildlife Service's designation of owl habitat lying beneath the MTRs and, as a consequence, it failed to address the cumulative effects associated with the USAF's need to avoid the owl habitat. See Petitioners' opening brief at 50. The administrative record shows that the FWS's critical habitat designations were overturned before the GAF Beddown EIS was completed, so the USAF did not have to address in its impact statement the issue of critical habitat avoidance. See Administrative Record, volume 1, book 7 at 1992 (page 27). That point notwithstanding, the administrative record shows that USAF did in fact consider the Mexican spotted owl in its final decision. See id. at 2091-92 (listing mitigation measures that will be observed during the Mexican spotted owl breeding season).

### 5.     connected actions

Petitioners claim the GAF Beddown EIS fails to take into consideration connected actions, because the "USAF issued only an EA at the time of the initial beddown of 12 Tornados, although it was aware at that time of the anticipated full complement of 42 at a more politically opportune time." Petitioners' opening brief at 51. The Court has already addressed the issues and arguments raised by that claim. See supra at 29-30. The Court will therefore not repeat its analysis here. For the reasons stated, the USAF did not fail to take into consideration connected action in its GAF Beddown EIS.

**F.      Economic and Environmental Impacts**

**1.      economic**

Petitioners claim the USAF failed to adequately address the economic impact associated with the proposed beddown.  See Petitioners' opening brief at 52.  The Court addressed that claim when it addressed the "land valuation" issue.  See *supra* at 16-18.  In addressing the land valuation issue, the Court explained that the USAF discharged its NEPA-duties by disclosing and then forthrightly discussing its inability to quantify the diminution in land values--and, by extension, any economic considerations reasonably related to the diminution in land values.  See id.  For the reasons stated, the USAF adequately addressed in the GAF Beddown EIS the economic impacts associated with the proposed beddown.

**2.      environmental**

Petitioners claim the USAF failed to adequately address the environmental impact associated with the proposed beddown.  See Petitioners' opening brief at 53.  That claim raises issues and arguments that have already been addressed by the Court.  For example, Petitioners claim that "[a]bsent from the EIS is a thorough analysis of the impact of the low-level flights and NTC on the Mexican spotted owl."  Id.  In the following sentence, Petitioners acknowledge that "[t]his issue is addressed in the prior section with regard to cumulative effects."  Id.  That being the case, the Court will not repeat its analysis here.  For the reasons stated, the USAF adequately addressed in the GAF Beddown EIS the environmental impacts associated with the proposed beddown.

**G.      Purpose and Need**

Federal agencies like the USAF must provide within their impact statement the purpose and need for the proposed action.  See 42 C.F.R. § 1502.13.  In this case, Petitioners claim the GAF

Beddown EIS does not contain an adequate statement of purpose and need.  See Petitioners' opening brief at 54.  While framed as an issue of administrative law, Petitioners' claim in effect asks this Court to address whether the proposed beddown was militarily necessary; that is, whether the United States has received something of value in exchange for allowing the GAF to perform military training exercises at HAFB.  See id. at 54 ("However, there is no commensurate tangible benefit to the United States, simply the belief that the beddown will strengthen daily contacts between the two air forces.").  This Court is in no position to second-guess or interfere with the USAF's decision that it is in the United States' interest to allow Germany, a NATO ally, to perform military training exercises at HAFB.  See Custer County Action Ass'n, 256 F.3d at 1031, *citing* Gilligan v. Morgan, 413 U.S. 1, 5-11 (1973) (holding that issues of military training are professional judgments to be made by the legislative and executive branches, not the judicial branch).  The USAF, having provided in the GAF Beddown EIS the purpose and need justifying the proposed action, did all that it was required to do under NEPA.  See id.; Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195-96 (D.C. Cir. 1991).

## IV.
## CONCLUSION

For the reasons set forth above, the Court finds that the USAF's final decision should be affirmed because it is neither arbitrary, capricious, nor without reasonable foundation.  An Order in conjunction with this Memorandum Opinion will issue.

DATED at Albuquerque this 27th day of August, 2002.

_____
BRUCE D. BLACK
United States District Judge

**Attorneys:**

For Plaintiffs:

        Frank M. Bond, Santa Fe, N.M.
        Joseph Van R. Clarke, Santa Fe, N.M.
        Faith Kalman Reyes, Santa Fe, N.M.

For Defendants:

        Raymond Hamilton, Albuquerque, N.M.
        Peter Bogy, Arlington, Va.
        Lt.Col. James Sinwell, Arlington, Va.